UNITED STATES of America

v.

Michael John SANDERS.

Crim. No. 23267.

United States District Court,
E. D. Pennsylvania.

Feb. 11, 1971.

Louis C. Bechtle, Philadelphia, Pa., for plaintiff.

Anthony Caiazzo, Philadelphia, Pa., for defendant.

## OPINION

MASTERSON, District Judge.

The defendant in this case was convicted of bank robbery by a jury after a 12 day trial. Before the trial we held extensive hearings on defendant's motions to suppress various items of evidence. Those motions were denied. Presently before the Court are defendant's motions in arrest of judgment and for a new trial. The defendant asserts the following grounds for relief:

I. Both the line-up identifications and the resulting in-court identifications of defendant should not have been admitted into evidence during the trial because defendant was denied full and

effective representation by counsel at the line-up;

II. The suggestive nature of a statement made prior to the line-up, the suggestive nature of the line-up and the displaying of the recent color photograph of Sanders in the prosecuting attorney's office just prior to trial made the admission into evidence of the line-up identifications and the in-court identifications a violation of due process;

III. The Government improperly obtained a list of defense witnesses and used it to the defendant's prejudice;

IV. The defendant was denied a fair trial by the suppression of evidence by the Government;

V. Defendant's Fifth Amendment privilege against self-incrimination was violated when re-enacted line-up photographs were shown to the jury;

VI. Evidence of post-custodial photographic identifications of defendant in absence of counsel was inadmissible;

VII. The introduction into evidence of a photograph purporting to be that of the defendant was without proper foundation and constituted reversible error;

VIII. The introduction into evidence of a "mug shot" bearing the name of the defendant constituted prejudicial error because it indicated that the defendant had a prior criminal record;

IX. The defendant was denied a fair trial because F.B.I. Agent Culpepper spoke to a prospective witness about his testimony in violation of an Order of the Court;

X. The display of a "Wanted Poster" of defendant, in proximity to the jury, requires a new trial;

XI. The prosecutor's closing argument constituted unfair comment of the defendant's failure to testify and is reversible error.

For the reasons set out below, the defendant's motion must be denied.

## I. REPRESENTATION BY COUNSEL AT LINE-UP.

In early May, 1968, the defendant was apprehended in New York City and later was removed to the Detention Center in Philadelphia. On May 16, 1968, which was 12 days prior to the appointment of trial counsel, the defendant was a participant in a line-up in which he was identified by the witnesses as the bank robber. At the line-up, the defendant was represented by an attorney associated with the Public Defender's office. It is the defendant's contention that trial counsel should have been appointed earlier in order to represent the defendant at the line-up and, even if "substitute" counsel (*i. e.* the Public Defender) were sufficient at this stage, his representation of the defendant at the line-up was so inadequate that both the line-up identification and subsequent in-court identification by the witnesses should not have been admitted into evidence. We disagree.

In United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), where the right to counsel at a line-up was established, the Supreme Court left open " * * * the question whether the presence of substitute counsel might not suffice where notification and presence of the suspect's own counsel would result in prejudicial delay." 388 U.S. at 237, 87 S.Ct. at 1938. Further, an accompanying footnote recognizes that " * * * substitute counsel may be justified on the ground that the substitute counsel's presence may eliminate the hazards which render the lineup a critical stage for the presence of the suspect's *own* counsel."

Initially, we should point out that the Public Defender who represented the defendant at the line-up was not a "substitute" counsel in the real sense of *Wade* since, at the time of the line-up, no other counsel had been previously appointed to represent the defendant. Nor do we find that there was an unreasonable or prejudicial delay in the ultimate appointment of trial counsel to represent the defend-

ant. In any event, we think the important question is whether the representation provided the defendant at the line-up was adequate (a) to safeguard the defendant in an identification process attended with hazards of serious unfairness, to wit, the suggestive manner with which such line-up confrontations can be conducted, and (b) to preserve for the defendant the ability to effectively reconstruct at trial the manner and mode of the line-up. In our view, if these purposes are met then the requirements in *Wade* are satisfied, whether the representation at the line-up be handled by the accused's own counsel or substitute counsel. See United States v. Kirby, 138 U.S.App.D.C. 340, 427 F.2d 610 (1970).

Testimony at the suppression hearing indicated that the Public Defender was present during the whole time in which the line-up was conducted. Before the witnesses viewed the line-up, the Defender satisfied himself that the line-up was a fair one and, in fact, requested the police to permit the defendant to remove his glasses, which was the feature that most distinguished the defendant from the other line-up participants. This request was granted. (See Notes of Suppression Hearing, hereafter "S.H.", 384). Although having had only limited communication with the defendant, the Public Defender made extensive notes during the line-up and recorded the following information: the height, weight, name and position of the participants in the line-up; the fact that the defendant wore dark brown shoes while the other line-up participants wore black shoes; the method by which the witnesses were permitted to observe the line-up and signify their recognition of any of the participants. (S.H. 102, 104, 107). These notes were relied upon by the Public Defender as a basis for refreshing his recollection at the suppression hearing and it is clear that they could have been produced for the benefit of the defendant for use during the trial, should they have been requested. (See, S.H. 6, 40–1, 376, 447, 455).

On the basis of the Public Defender's notes and testimony, as well as the extensive testimony of the other witnesses at the suppression hearing, we were able to evaluate the manner and mode of the actual line-up and to reenact the line-up in the courtroom. (See Exhibits G–4, 5). From this complete record, we were convinced that the legal representation afforded the defendant by the Public Defender was adequate under *Wade* to assist in the reconstruction of the actual line-up and to assure a fair line-up in which no unnecessarily suggestive procedures were employed by the police. (S.H. 475–78). Indeed, even if we were to find that the Public Defender did not do all that could have been done, the degree and quality of his representation would in no way alter our ultimate conclusion that the line-up was fair. In either case, it was not prejudicial error to admit the identification testimony into evidence.

Further, we should like to add that the practice of having a Public Defender represent an accused at a line-up, prior to the appointment of trial counsel, is an attempt to accommodate the dictates of *Wade* with practical necessities. We think the practice, as applied in this case, is a salutary one and in view of the frequency of its use it is hoped that the Court of Appeals will speak authoritatively on its propriety.

## II. ADMISSION INTO EVIDENCE OF THE LINE-UP IDENTIFICATIONS AND THE IN-COURT IDENTIFICATIONS.

It is the defendant's contention that the admission into evidence of both the line-up and in-court identifications violated due process because of the existence of the following circumstances:

(a) that prior to the line-up an FBI agent told the witnesses that the man they had identified through photos had been apprehended;

(b) the alleged suggestive nature of the line-up;

(c) prior to trial, the witnesses had accidentally viewed a recent color photo of the defendant which was on the prosecutor's office desk.

On the basis of (a) and (b), *supra,* defendant argues that, under the totality of the circumstances, the line-up procedures were "so unnecessarily suggestive and conducive to irreparable mistaken identification" that the defendant was denied due process. See Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

■ To put the defendant's argument in proper perspective, we think it important to discuss the *pre*-lineup identifications made by the witnesses, for the possibility of misidentification in the first instance is part of the totality of circumstances which this Court must consider in determining whether any subsequent identification procedures (*i. e.* the line-up) were unnecessarily suggestive. In this regard, our oral ruling at the conclusion of the suppression hearing is instructive:

"* * * Basically the motion was directed at suppressing the testimony of four Government witnesses—Marie Carrick, the manager of Bell Savings and Loan Association; Michele Amoroso, the head teller at the bank; Laura Sicalides, a customer present in the bank at the time of the robbery; and one Charles Goerlach, who allegedly drove the robber from the scene of the crime.

Basically the defendant maintains that all of these witnesses should be prevented from testifying in this case because of the Supreme Court's ruling in United States v. Wade, Stovall v. Denno, and Simmons v. United States [390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247].

The defendant's motion initially is that the testimony should be barred because it will be based on the witnesses' recollection of the photographs which the defendant claims were exhibited to the witnesses in an unnecessarily suggestive manner, which was conducive to irreparable mistaken identification as in *Stovall.*

The contention is that the admission of any identification testimony, which had its origin in an initial identification of photographs, would be a deprivation of the defendant's Constitutional rights.

I have carefully considered all of the testimony with respect to the photographic identification, and I have concluded that there is no evidence at all that there was any suggestion employed by the F.B.I. or anybody else in connection with this case to induce the witnesses to identify the photographs of the defendant as that of the robber. In making this determination I have followed the Supreme Court's direction to examine the totality of the circumstances surrounding the challenged identification.

Now, in this case the initial identification took place some seven months after the robbery. That time lapse was not due to any lack of diligence on the part of the F.B.I. It was due to the fact that the defendant was not apprehended until some seven months after the occurrence of the crime.

With respect to the initial identification, the robbery occurred in broad daylight at 11:00 o'clock in the morning. The robber did not wear a mask or make any other attempt to disguise himself. The bank was well lighted, and he was in the bank for ten to twelve minutes during which time he was subject to being observed by the witnesses Carrick, Amoroso, and Sicalides.

The testimony of all of them indicated that their attention was directed toward the defendant almost as soon as he walked into the bank because he was so, as the ladies said, beautifully dressed and was such a pleasant appearing young man. They also all noticed an extraordinary grace of movement and a constant grin, which he had during the entire procedure.

Now, the witness Sicalides who was the one who was taken hostage by the robber, not only had the opportunity to observe him in the bank but also had the opportunity to observe him as he forcibly took her about a block or so from the bank to the 69th Street terminal where he ran and got into a cab.

All of these eyewitnesses had abundant opportunity to observe the robber; and, of course, they had good reason to remember him and never to forget him.

After the robbery, the F.B.I. and local police showed hundreds of photographs of suspects to these witnesses; and they [the witnesses] consistently stated that the photographs that they were being shown were not that of the robber until some time in April of 1968 when each of them separately was given some thirty-two or thirty-six photographs to look at. At that time the F.B.I. agent simply stated that they should look over the photographs and see if they recognized anybody. Each of them separately at that time picked out the photograph of the defendant as that of the robber. None of them had any hesitation in picking out his photograph and his alone.

Now, there was an early episode where Mrs. Amoroso indicated that one previous photograph looked something like the robber; but after having said that, she immediately stated that it was not the robber. So there is no history of previous mis-identification in this case.

Therefore, I have concluded that the photographic identification of the defendant by all four eyewitnesses in April of 1968 was not the result of procedures so unnecessarily suggestive as to make mis-identification almost inevitable.

I conclude on the contrary that the identification procedures employed by the F.B.I. were perfectly proper, were in no way suggestive, and that the defendant's photograph was picked from a group of photographs by the witnesses because they recognized him and for no other reason." (S.H. 471–75).

■ Thus, positive and discerning independent identifications had been made by the witnesses prior to both the line-up and the F.B.I. agent's statement that the man they had identified had been apprehended. After having made such positive identifications, it was not unreasonable for the witnesses to assume that the man they had identified would be a participant in the line-up. The statement to the witnesses by the F.B.I. agent, while improvident, merely reenforced this assumption, and in light of all the circumstances, particularly the positive pre-lineup identifications and the fairness of the actual line-up (See S.H. 475–78), we find that the admission into evidence of the identifications did not violate due process.

■ The defendant also claims that the accidental "confrontation" of the witnesses with a post-arrest color photograph of the defendant (Defendant's Exhibit No. 4) after the line-up and before trial was prejudicial and unnecessary. While we agree that the accidental "confrontation" was unnecessary, we do not think that under all the circumstances, particularly the prior history of positive identification by the witnesses in this case, that the viewing of the color photos was prejudicial. (See our discussion in Section IV, *infra*).

### III. THE LIST OF DEFENSE WITNESSES OBTAINED BY THE GOVERNMENT.

■ Pursuant to Rule 17(b) of the Federal Rules of Criminal Procedure, the defendant made *ex parte* application, on the basis of his indigency, for a court order to subpoena witnesses and to have the fees of witnesses so subpoenaed paid by the Government. In connection with this application, defendant filed a sealed list of witnesses. This *ex parte* application was granted, but a protective order to prevent the Government from obtaining the names of the witnesses was

denied. Apparently, the Government did obtain a copy of the witness list and the witnesses were interviewed by the F.B.I. There is no indication how this list found its way into the Government's hands, though the usual procedure is for the U. S. Marshal to submit the witness list to the U. S. Attorney who authorizes the expenditures. Defendant argues that, since the Government is not entitled to discovery of the names of defendant's witnesses and since the Government obtained discovery solely because of defendant's indigency and the necessity of his resort to Rule 17(b), he is entitled to a new trial on the theory that his rights to due process and equal protection of law have been violated. We do not agree.

Defendant called the witnesses in his case for the ostensible purpose of establishing an alibi. They testified, in general, as to having seen the defendant in Rockford, Illinois, as late as 19 hours before the crime. These witnesses gave similar details to the F.B.I. The difficulty with the alibi defense was that it did not account for the 19 hours referred to above during which the record shows that the defendant could have flown to Philadelphia, committed the robbery, and flown back to Rockford. None of the witnesses were cross-examined on the basis of inconsistent statements given to the F.B.I. Hence, there has been no prejudice to defendant because the Government obtained a copy of the witness list. Further, although defendant was allowed to interview these witnesses without cost, the protective order he sought, addressed to the Court's discretion, was denied. We can find no abuse of this discretion.

## IV. SUPPRESSION OF EVIDENCE BY THE GOVERNMENT.

Several months after the robbery for which defendant was convicted, several eyewitnesses were shown photographs of suspects. A photograph of the defendant was selected by each as the in-dividual who in their opinion was the bank robber. (Exhibit G–2A). In May, 1968, defendant was arrested. Prior to a line-up, at which these eyewitnesses again identified the defendant, the witnesses were not shown any photo of defendant, not even the photo they were originally shown in April. After the line-up and before the defendant's trial it appears that the witnesses were again shown the photo of defendant which they originally selected. Though color photos of the defendant were taken at the time of his arrest, the U. S. Attorney informed the Court that these were not exhibited to the witnesses after the line-up. The defendant argues that, contrary to the U. S. Attorney's representations, these color photos were seen by two witnesses and that the U. S. Attorney's false representation amounted to a suppression of evidence by the Government and a denial of due process to the defendant. Defendant claims specific prejudice from this alleged misrepresentation in that the suppression of this evidence prevented the Court from evaluating the effect of this photographic showing on our decision that the witnesses' in-court identifications of the defendant were admissible.

We have carefully reviewed the record on this point and cannot conclude that the U. S. Attorney intentionally suppressed evidence. At worst, there was some carelessness on the U. S. Attorney's part in leaving the color photos on his desk when witnesses were in his office. However, it does not appear that there was any actual request made of the witnesses to identify the individual in the color photos as the bank robber. Under these circumstances we cannot say there was intentional suppression of evidence and a denial of due process. Moreover, it is unlikely that the fact that the witnesses did see these color photos, whether accidentally or not, would have affected our decision, under all the circumstances, to admit into evidence the in-court identification of the defendant.

## V. ADMISSION INTO EVIDENCE AND SUBSEQUENT DISPLAY TO THE JURY OF RE-ENACTED LINE-UP PHOTOGRAPHS.

At the hearing on defendant's motion to suppress, re-enacted photographs (G–4, 5) of the police line-up were taken at defense counsel's insistence for the purpose of making the record complete. (S.H. 172). At the trial, these photographs were admitted into evidence and given to the jury, both over the objections of defendant's counsel. (Notes of Trial Testimony, hereafter "N.T.", 829, 1285–86).

It is the defendant's contention that, at the suppression hearing, he waived his Fifth Amendment right against self-incrimination for the limited purpose of testifying to the substantial accuracy of the re-enacted line-up photos in the belief that the photos were to be used only for the purpose of making the record complete in the event of appellate review. The defendant asserts that the further use of the photos—their admission into evidence at the trial—was, due to the limited waiver, a violation of his Fifth Amendment privilege because the introduction of the photographs at trial was based *entirely* upon defendant's communications to the Court of his consent to the taking of the photographs and his testifying to their substantial accuracy. On this basis, the defendant urges that a new trial be granted.

■ The defendant is gravely mistaken in his assertion that the *sole* basis for the court's allowing the re-enacted line-up photos into evidence at the trial was due to the defendant's testimony at the suppression hearing. At the suppression hearing the defendant merely stated that the only difference between the original line-up and the re-enactment was that in the original line-up he had a crew cut, wore brown shoes, and his complexion had a more pale cast. (S.H. 412–13). However, testimony as to his hair style and color of his shoes had been introduced through other witnesses. (See, e. g., S.H. 382, 409–10).

Thus, the testimony of the defendant was not necessary for this Court's determination of both the fairness of the original line-up and the accuracy of the re-enactment, as there was available to the Court testimony from other witnesses upon which we could, and did, rely, as well as our own independent evaluation. Accordingly, the defendant's motion for a new trial on this ground must be denied.

## VI. POST - CUSTODIAL PHOTOGRAPHIC IDENTIFICATION OF DEFENDANT IN ABSENCE OF COUNSEL.

As we have noted in Section IV, *supra,* there were two kinds of post-custodial photographic identification of the defendant. First, some time after the defendant's line-up, the identification witnesses were shown the black and white photo of defendant (Exhibit G–2A) from which they identified him before his arrest. Second, two identification witnesses saw recent color photos of the defendant in the office of the U. S. Attorney due to his carelessness in leaving the photos on his desk when witnesses were in his office. The question that confronts us is the effect of the recent Third Circuit decision in United States v. Zeiler, 427 F.2d 1305 (3rd Cir. 1970), concerning post-custodial photographic viewings.

In *Zeiler* the Court held that post-custodial pre-trial photographic identifications of an accused by identification witnesses requires the presence of the accused's counsel. If counsel is not present, evidence of such photographic identification is inadmissible. For the reasons set out below, we believe *Zeiler* has no effect on the case at bar.

■ First, the photographic viewings involved in the trial of this case and our denial of pre-trial suppression motions with respect to photographic identifications all occurred substantially before the *Zeiler* case was decided. In order for *Zeiler* to apply it must apply retroactively and we do not think it should be so applied.

■ Second, even if it did apply, the case at bar is clearly distinguishable on its facts from *Zeiler*. As to the black and white photo in our case, unlike in *Zeiler*, the witnesses identified the man pictured in the photo as the bank robber *prior to* defendant's arrest,[1] as well as after his arrest, and the testimony at trial was limited to the witnesses pre-arrest photographic identification. As to the color photos, there was no real photographic identification in the sense of the *Zeiler* case, but merely a casual viewing of the photos which were carelessly left on the prosecutor's desk.

For these reasons, then, defendant's motions, insofar as they are based on *Zeiler*, must be denied.

## VII. ADMISSIBILITY OF EXHIBIT G–2A.

The black and white photo (Exhibit G–2A) we have been referring to was introduced into evidence and shown to the jury. (N.T. 267). Defendant contends that this photo was admitted without proper foundation and is grounds for a new trial.

■ Defendant argues that before Exhibit G–2A could be admitted it was necessary for there to be testimony that the man pictured in the photo was the defendant, otherwise the jury could convict the defendant on the basis that he looks like the man pictured. We do not agree. We believe that the photo was admissible and, even if it were not, its admission was not reversible error. It was clear that the defendant was Michael John Sanders and that the photo purported on its face to be one of Michael John Sanders. The jury was free to conclude that the defendant and the man in the photo were one and the same. Moreover, even if this photo were not admissible, there was such other overwhelming evidence identifying the defendant as the bank robber that the jury could have convicted defendant without any evidence of the identification of photo G–2A by the identification witnesses.

## VIII. THE INTRODUCTION OF EXHIBIT G–2A AS INDICATING THAT THE DEFENDANT HAD A PRIOR CRIMINAL RECORD.

Defendant argues that because Exhibit G–2A is a "typical mug shot" which contains information on its face—"Michael Sanders, FBI No. 210, 431D"—and on the back—a description of Sanders, the fact that the photos were taken in 1962, and that he was sought for "Interstate Flight—Armed Robbery"—its admission into evidence and exhibition to the jury during the trial was tantamount to telling the jury that the defendant had a prior criminal record and, thus, constituted reversible error. We disagree.

■ Initially, we believe it instructive to briefly review the circumstances which occasioned the introduction of the allegedly prejudicial photo. The principal issue in this case was the reliability and credibility of the eyewitnesses' identification of the defendant as the bank robber. The Government's first identification witness, Mrs. Amoroso, testified that she had identified the defendant from a series of 36 photos shown her by the investigating authorities. The photo which she originally selected, which was marked as Exhibit G–2A, was identified again at trial by Mrs. Amoroso during her testimony on direct, but the photo was not exhibited to the jury at this time. On cross examination, defense counsel, in an apparent attempt to impugn the reliability of Mrs. Amoroso's identification testimony, questioned the witness as to whether the man pictured in Exhibit D–5 (a "mug shot" of an individual other than the defendant) had been previously selected by her as being "similar" to, but was not, the bank robber. Defense counsel then requested, and was granted, leave to show Exhibit D–5 to the jury. (See, N.T.

---

1. The defendant was identified from the black and white photo on April 8, 1968 and was arrested in May, 1968.

204–06). As we view it, the Government then had the right to offset any inference of mistaken identification that may have arisen from the showing of Exhibit D–5 to the jury by allowing them to also view Exhibit G–2A. In order to evaluate the photographic identification of the defendant by Mrs. Amoroso, it was necessary that the jury compare G–2A and D–5. Hence, since it was defense counsel that opened the door to the exhibition of G–2A to the jury, he cannot be heard to object.

■ We should also note that, during the course of the trial, a new exhibit (G–2A–2), one without any writing, was substituted for Exhibit G–2A. It was this exhibit, i. e. G–2A–2, that went out with the jury. Further, even if this "mug shot" should not have been introduced into evidence and shown to the jury, the error does not, in the context of the whole trial, warrant a new trial for, in our opinion, there has been no showing of substantial probability that the defendant's prior criminal record was impressed on the jury. Indeed, it can be well said that, if the impression were made, defendant's counsel initiated and contributed to it by requesting that D–5 be shown to the jury as well as insisting, over the Government's objection, that D–4 (a colored "mug shot" of the defendant taken shortly after his arrest) be admitted into evidence and go out with the jury. (See N.T. 1111).

## IX. SEQUESTRATION ORDER.

During the suppression hearing, the Court ordered that no witnesses should talk to each other, and later confirmed that the sequestration of witnesses applied to the trial as well. (N.T. 109). The defendant argues that, since F.B.I. Agent Culpepper spoke to a prospective witness (F.B.I. Agent Weiner), the Court's order was violated and the defendant was denied a fair trial.

■ Suffice it to say that we are satisfied that Agent Culpepper did not knowingly violate the Court's sequestration order for at the time he spoke to Weiner he had no idea that Weiner would eventually be called as a witness. (See Government's Brief, pp. 25–26). Further, we do not find that this unintentional violation of the Court's order was so prejudicial to the defendant as to require a new trial.

## X. "WANTED POSTER".

During the trial it was discovered that an F.B.I. "Wanted Poster" of the defendant (GD–5) was displayed on the Post Office bulletin board located on the first floor of the United States Courthouse. Printed on the poster was information that the defendant was a fugitive and wanted for armed robbery in California. It is the defendant's argument that the existence of this poster raises the "serious possibility" that the jury saw it and, thus, evidence of defendant's prior criminal record, which was otherwise inadmissible at the trial, nonetheless got before the jury. On the basis of this possibility, defendant requests a new trial.

Initially, it should be stated that upon learning of the poster's existence, the Court ordered that, before removal, pictures be taken for the record of the poster as it appeared in the Post Office.[2] The Court then held a hearing, out of the presence of the jury, to determine whether any Government representatives placed the wanted poster on the Post Office bulletin board for the purpose of introducing evidence of the defendant's prior criminal record. Having been satisfied that there had been no such attempt by representatives of the Government, the Court then attempted to discern whether any members of the jury had seen the poster. So as not to "flag" the problem, we addressed the following interrogatories to the jury:

THE COURT: "Now, I ask you all: Have you since taking your oath as jurors in this case, discussed it with

---

2. We should note that due to the positioning of the poster on the Post Office bulle-

tin board the name of the defendant was not visible. (See GD–1, 2, 3; N.T. 1121).

anyone? (No response.)" (N.T. 1187).

THE COURT: "Have any of you seen anything have you heard anything on the radio, T.V., or has anybody told you anything respecting the facts of this case or the defendant in this case outside of this very court room? (No response)." (N.T. 1188).

 On the basis of our finding that the wanted poster was partially obscured such that the defendant's name was not visible, and on the basis of our being convinced that the poster's appearance was not an insidious device of the prosecution, and because we are satisfied that the jury did not see the wanted poster, we do not think that even the "possibility" of prejudice is evident here. Further, we submit that even were the "possibility" evident, it falls far short of the "substantial probability" of prejudice which we would require to be shown if we were to consider granting a new trial.

### XI. UNFAIR COMMENT ON DEFENDANT'S FAILURE TO TESTIFY.

Lastly, defendant argues he is entitled to a new trial because the prosecutor in his closing argument unfairly commented on the defendant's failure to testify. We have carefully reviewed the record on this point and believe that no unfair comment was made by the prosecutor.

The prosecutor's closing argument in part attempted to weaken the defendant's alibi defense. Defendant accounted for all but nineteen hours of the time period in question at trial and the prosecutor merely raised the question of what happened during these nineteen hours. There was no "strong implication" that defendant should have testified to explain these nineteen hours. Unless we foreclosed the prosecutor from any and all comment on the alibi defense, which would clearly be improper, then the com-

ments he made cannot be considered unfair.

In conclusion, we should like to note that, during a trial of such length [3] and complexity as the one at bar, some error is bound to occur. However, the important question is whether the error was such that the defendant was prejudiced and denied a fair trial. After carefully reviewing the whole record in disposing of the instant motion, our conviction was reenforced that the defendant here was given a full and fair trial.

---

3. Including both the pre-trial hearing on defendant's motion to suppress and the trial, this case consumed about one month.