Duane A. TOWLES, Appellant,

v.

UNITED STATES, Appellee.

No. 12982.

District of Columbia Court of Appeals.

Argued Oct. 12, 1978.

Decided March 13, 1981.

Richard S. Bromberg and Roger H. Moore, Washington, D. C., appointed by the court, for appellant.

Charles L. Hall, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., when the brief was filed, and John A. Terry, Michael W. Farrell and Harry R. Benner, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and KELLY and HARRIS, Associate Judges.

HARRIS, Associate Judge:

This is an appeal from convictions after a trial by jury of first-degree murder, D.C. Code 1973, § 22-2401; two counts of attempted robbery while armed, *id.*, §§ 22-2902, -3202; and carrying a pistol without a license, *id.*, § 22-3204. Asserted as errors are the following: (1) the trial court's denial of a motion to dismiss the charges for violation of appellant's right to a speedy trial; (2) certain rulings of the trial court with respect to the government's identification evidence, namely, (a) a denial of appellant's motion to suppress allegedly suggestive photo array and lineup identifications, (b) a refusal to permit appellant to introduce certain evidence at the identification suppression hearing, and (c) a refusal to permit appellant to be absent during the suppression hearing; (3) the trial court's failure to give an immediate cautionary instruction to the jury when the government sought to impeach its own witness by means of a prior inconsistent statement, and (4) the court's subsequent allowance of testimony, over defense objection, as to another's out-of-court statement which formed the basis for the witness' prior inconsistent statement to the police.

While we find no merit in appellant's other claims, we conclude that the trial court committed plain error in failing to give a cautionary instruction.[1] We reverse on that ground and remand the case for a new trial.

## I

Dr. Patricio Paez and Andre Colpitts left a Washington restaurant at around 11:00 p. m. on May 21, 1976. As the two were passing through a poorly-lit alley towards their parked car, two black male youths suddenly accosted them from behind. One of the youths, brandishing a pistol, demanded that the two men hand over their wallets. As Dr. Paez reached to comply, the gunman opened fire—killing Mr. Colpitts and wounding Dr. Paez.

The two assailants fled the scene.[2] As they ran out of the alley, they passed by a car being driven by Rudolph Singleterry. Singleterry was turning into the alley at the time and got a brief look at the offenders as they came through the field of his car's headlights.

Due to the poor lighting conditions and the brevity of the encounter, Dr. Paez was not able to get a good look at his assailants' faces, and could relate to investigating officers only a general description of their clothing, body builds, and the fact that they were "very young." He told Metropolitan Police Department Detective William Wood a few days after the shooting that he probably would not be able to recognize the assailants again. Singleterry, on the other hand, maintained that he had had a good view of the assailants for about ten seconds as they passed in front of him while they were illuminated by the headlights of his car.

### A. The Suppression Hearing

On June 29, 1976, Detective Wood showed a photo array (14 front and side view photos) to Singleterry. It is possible that Detective Wood told Singleterry to "pick out two" of the photographs from the group. Appellant claims this statement made the photo array impermissibly suggestive. Singleterry picked out a photograph of appellant, and also selected one of another person who was not involved in the crime. Singleterry indicated that while he was not certain of the photo of the other person, he was certain of the photograph of appellant, as it was the latter who had passed by the driver's side of his car on the night of the crime.

On July 26, 1976, some nine weeks after the crime, both Paez and Singleterry attended a lineup which included appellant. Again, Singleterry picked out two persons—appellant and a police officer. Again he stated that he was sure of appellant but was not certain of the other one. Detective Wood then told Singleterry that the person he had identified with certainty (appellant) was the prime suspect and that the other one he had chosen was not. Dr. Paez also was able to identify appellant in the lineup as the gunman. He based his identification not on facial appearance, but on appellant's peculiar body movements.

Appellant cites several features of the lineup which allegedly made the procedure impermissibly suggestive and hence suppressible. Initially, appellant points to the fact that at least six of the ten lineup subjects were visibly older than appellant— with reference to Dr. Paez' original description of the assailants as very young. In addition, appellant claims that several of the subjects differed obviously from appellant in stature, build, and the presence of facial hair. Finally, it is claimed that appellant improperly was highlighted by virtue of his placement at the center of the line (along with one other subject in the

1. We do not reach appellant's hearsay challenge to the admission at trial of the prior inconsistent statement as the witness' recollection of what another man had told him.

2. Appellant was identified and convicted as the gunman. In a separate juvenile proceeding, another individual was found guilty of first-degree murder and related offenses as his accomplice. The juvenile's convictions were affirmed by an unpublished Memorandum Opinion and Judgment. *In re N.N.S.*, No. 11834, Apr. 11, 1979.

line of ten), his being assigned identification shield number one, and his wearing a white tee-shirt. (One other subject was a wearing a white tee-shirt.)

At the suppression hearing the court considered the evidence as to the alleged suggestivity of the pretrial identification procedures. The trial judge examined photographs of the lineup. He refused appellant's proffer of further evidence allegedly bearing on the suggestivity issue. Specifically, appellant wished to present (1) another man who had seen the assailants fleeing, but who had not identified appellant at the lineup, and who would testify to the disappointment shown by the police at his "unsuccessful" try at identification; (2) a police employee who would give the actual ages of all of the lineup subjects; and (3) a videotape of the lineup proceeding. The trial court concluded that this proffered evidence would be irrelevant and/or cumulative.

In addition, appellant challenges the trial judge's insistence that appellant be present during the suppression hearing regardless of his desire to waive his right to be present. The court took the position that appellant had to be present so that there could be a determination of the witnesses' ability to make in-court identifications. Both witnesses made positive identifications of appellant at the hearing.

The court denied the motion to suppress the pretrial identifications, ruling that they—as well as in-court identifications—would be admissible.

### B. The Trial

The government, in preparing its case against appellant, had obtained a statement from Hervie Hunter directly inculpating himself and appellant. Hunter and two other youths, in separate juvenile proceedings, already had been convicted of participation in this crime. The essence of Hunter's statement to police was that appellant was the fourth person involved—with appellant and a second youth as the actual assailants, while the other two (including Hunter) acted as lookouts.

At trial, however, when the government called Hunter to corroborate his pretrial statement, he denied having seen appellant on the evening of the crime at all. Claiming surprise, the prosecution requested and was given leave to impeach the witness by means of his prior inconsistent statement. Appellant's counsel did not at that point request that the court give the jury a cautionary instruction regarding the limited purpose for which the prior statement was to be introduced, and the court did not give such an instruction sua sponte. (A cautionary statement was included in the court's lengthy general charge to the jury at the close of the evidence.) The prosecutor confronted Hunter with virtually his entire previous statement, piece by piece, and Hunter steadfastly denied its truth. When the government pressed Hunter as to whether he was disavowing his prior statement out of fear of reprisal by appellant's family, Hunter at first answered in the negative, and then admitted some fear. Finally, he repeatedly denied any such fear, and denied the truth of his prior statement.

On cross-examination, appellant's counsel, seeking to further undercut the credibility of Hunter's prior statement, elicited from the witness that he had given the statement to police in return for a promise of leniency in sentencing, and that he had picked up the inculpatory information on appellant "off the street"—that he in fact had no personal knowledge of the crime. The prosecution followed up on redirect by inquiring where Hunter had gotten this "off the street" version of the crime. The witness responded that he had heard the story from a Mr. Battle. Counsel then proceeded to draw from the witness (over appellant's hearsay objection) the details of what Battle supposedly had told him. In this way the government succeeded, in effect, in getting virtually the entire inculpatory statement before the jury for a second time—without any cautionary statement having been given. Finally, the text of Hunter's statement was admitted into evidence for the jury's consideration.

After considering all of the evidence, including the pretrial and in-court identifications by Paez and Singleterry, and the pre-

trial statement and in-court testimony of Hunter, the jury found appellant guilty.

### C. Speedy Trial

The crimes were committed on May 21, 1976; appellant was arrested on July 13, 1976. He was presented the following day, when bond was set at $100,000. After the denial of several defense motions over the next few months (motions to obtain a transfer of place of detention, to obtain release in the custody of defendant's mother, and to obtain a reduction in the amount of the security bond), the grand jury returned an indictment on February 28, 1977. By order dated June 10, 1977, the court granted a motion to reduce bond to $20,000. On July 8, 1977, the court heard appellant's motion to suppress. The trial commenced on July 11, 1977, with the verdict pronounced two days later. Sentencing was conducted on November 23, 1977.

Appellant was incarcerated during the entire pretrial period. At the time of his arrest, appellant was an escapee from the Oak Hill youth detention center, and for the entire pretrial period he was under an order of detainer from that facility based on time remaining on a commitment from an unrelated prior offense.

### II

Consideration of the chronology of events in this case leads us to reject appellant's claim that he was denied his Sixth Amendment right to a speedy trial and that the charges against him therefore should be dismissed.

The Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), set out a flexible four-prong balancing approach to be followed in determining whether delay in bringing a defendant to trial reaches constitutional dimension.[3] *Accord, Branch v. United States*, D.C.App., 372 A.2d 998 (1977); *Moore v. United States*, D.C.App., 359 A.2d 299 (1976).

The *Barker* Court instructed that the length of delay is the primary factor (the "triggering mechanism") and that "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." 407 U.S. at 530, 92 S.Ct. at 2191.

The Court declined to dictate a time beyond which presumptive prejudice inheres and a full-scale inquiry into the circumstances surrounding the delay is required. (The delay in *Barker v. Wingo* was approximately five years.) In this jurisdiction, a period of a year or more between arrest and trial gives prima facie merit to a speedy trial claim and places a burden on the government to rebut the presumption of prejudice and otherwise argue the reasonableness of the delay.[4]

In cases of a time lapse of less than a year, prejudice must be affirmatively demonstrated by a defendant. *See Bowman v. United States*, D.C.App., 385 A.2d 28 (1978); *Branch v. United States, supra; Moore v. United States, supra; United States v. Holt*, 145 U.S.App.D.C. 185, 448 F.2d 1108, *cert. denied*, 404 U.S. 942, 92 S.Ct. 292, 30 L.Ed.2d 257 (1971). Here the interval was just under a year, thus leaving on the defendant the burden of demonstrating a constitutional violation.[5] *Crowder v.*

---

3. The key *Barker* factors are (1) length of delay; (2) reasons for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. 407 U.S. at 530–32, 92 S.Ct. at 2191–93.

4. Appellant suggests that the relevant measurements should be made from his arrest to sentencing. Sentencing in this case took place on November 23, 1977, some 16 months after arrest. Appellant's reliance on an isolated sentence in *Pollard v. United States*, 352 U.S. 354, 361, 77 S.Ct. 481, 485, 1 L.Ed.2d 393 (1957) ("We will assume *arguendo* that sentence is part of the trial for purposes of the Sixth Amendment") is misplaced. The Court in *Barker, supra,* clearly was thinking in terms of the passage of time from arrest to (not through) trial. 407 U.S. at 533–34, 92 S.Ct. at 2193–94. This court in *Moore v. United States, supra*, 359 A.2d at 302 n.7, dispelled any possible doubt on this question. *See also United States v. Brown*, 172 U.S.App.D.C. 92, 96, 520 F.2d 1106, 1110 (1975).

5. The term "delay" often is used imprecisely, since inevitably a rather significant period of time must elapse from arrest to trial—among other reasons to permit the protection of the

*United States,* D.C.App., 383 A.2d 336, 339 (1978). Appellant is unable to meet that burden.

■ Initially, there was little delay here "due to factors other than the normal administrative difficulties under which our criminal justice system labors." *Smith v. United States,* D.C.App., 379 A.2d 1166, 1167 (1977). Such reasons for a trial delay are considerably "more neutral" than deliberate prosecutorial delay and are "weighted less heavily" in a speedy trial determination. *Barker v. Wingo, supra,* 407 U.S. at 531, 92 S.Ct. at 2192. *See also Crowder v. United States, supra,* 383 A.2d at 339; *Adams v. United States,* D.C.App., 379 A.2d 961, 963 (1977); *Bond v. United States,* D.C.App., 233 A.2d 506, 511 (1967).

More importantly, appellant is unable to make the requisite showing of actual prejudice. The *Barker* Court displayed sensitivity to three types of prejudice against which the speedy trial right is designed to protect: oppressive pretrial incarceration; anxiety and concern of the accused pending trial; and impairment of the defense by delay. "Of these," the Court stated, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." 407 U.S. at 532, 92 S.Ct. at 2192.

■ Appellant does not seriously allege (let alone demonstrate) actual prejudice to his defense at trial. His claim of prejudice centers, rather, on his nearly 12 months of pretrial incarceration (with accompanying anxiety and concern). While lengthy pretrial confinement certainly is an unfortunate element of our backlogged criminal justice system, it is not by itself sufficient to warrant dismissal of the indictment. *Barker v. Wingo, supra,* at 532–33, 92 S.Ct. at 2192–93; *Moore v. United States, supra,* 359 A.2d at 302–03.

In *Branch v. United States, supra,* cited by appellant, we did direct dismissal of the charges where the accused had been con-
fined for eight months prior to trial. There, however, the real period between arrest and trial had been 16 months, thus triggering a full review under the *Barker v. Wingo* test. In *United States v. Young,* D.C.App., 237 A.2d 542 (1968), we found constitutional prejudice in a seven and one-half month delay. There, however, the government had unreasonably delayed trial on a charge of negligent homicide, while the accused had his taxi license suspended pending the outcome of the proceeding.

Our conclusion that appellant has not shown actual prejudice is buttressed by the fact that he was an escapee from a juvenile detention facility; during the entire pretrial period he was under an order of detainer based thereon. *See Bowman v. United States, supra* (no prejudice arises from pretrial incarceration on unrelated charge).

### III

We nonetheless reverse appellant's conviction because of the highly prejudicial effect of the trial court's failure to give a cautionary instruction sua sponte to the jury when the government properly impeached its own witness by means of a prior inconsistent statement.

This court has made it clear that reversals on appeal for errors not raised at trial will be the exception, and not the rule. *Johnson v. United States,* D.C.App., 387 A.2d 1084 (1978) (en banc). In *Watts v. United States,* D.C.App., 362 A.2d 706, 709 (1976) (en banc), we stated that such unchallenged errors

are unreachable on review unless they fall within the purview of the plain error rule. Under that standard, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial. *See Adams v. United States,* D.C. App., 302 A.2d 232 (1973); *Bunter v. United States,* D.C.App., 245 A.2d 839 (1968).

full panoply of a defendant's constitutional rights. "Delay" is thus a relative term, which acquires legal significance when it becomes inordinate.

*See also Johnson v. United States, supra; Harris v. United States,* 112 U.S.App.D.C. 100, 299 F.2d 931 (1962). In *Watts, supra* (involving an allegedly faulty jury instruction), we explained the rationale for our approach to these cases:

> The obvious reason for requiring that objections to instructions be made before the jury retires is to afford the trial court an opportunity to correct any instructional defect and thereby avoid error which otherwise might necessitate a new trial. [362 A.2d at 708–09.]

*See also Johnson v. United States, supra; United States v. Indiviglio,* 352 F.2d 276, 280 (2d Cir. 1965), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). Moreover, we are concerned with "discourag[ing] the intentional withholding of objections by defense counsel." *Watts, supra,* 362 A.2d at 709; *accord, United States v. Curry,* 358 F.2d 904, 912 (2d Cir.), *cert. denied,* 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100 (1966). *See also Johnson v. United States, supra,* 387 A.2d at 1086–87, 1089 n.10.

■ We will not, however, fail to consider a claim of plain error where it appears that a defendant was denied a fair trial. Assuredly we have "the discretionary power to notice defects raised for the first time on appeal if substantial rights were clearly and prejudicially denied below." *Johnson v. United States, supra,* 387 A.2d at 1088 (footnote omitted).

In *Johnson, supra* (in which the trial court did not give a cautionary instruction sua sponte to the jury when the prosecution properly impeached a defense witness by means of a prior inconsistent statement), we explicitly rejected the view which had been adopted by the court previously in *Lofty v. United States,* D.C.App., 277 A.2d 99 (1971), that "whenever evidence [is brought in which is admissible] only for a limited purpose, it is plain error, in the absence of manifest waiver, to omit an immediate cautionary instruction." 387 A.2d

at 1086, quoting from *United States v. McClain,* 142 U.S.App.D.C. 213, 218, 440 F.2d 241, 246 (1971); *see also id.,* 387 A.2d at 1087 n.4; *Dixon v. United States,* D.C. App., 287 A.2d 89, *cert. denied,* 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972). Nonetheless, we also noted in *Johnson* that a sua sponte cautionary instruction should be given when a party, surprised by its own witness, impeaches the witness with a prior inconsistent statement in accordance with D.C.Code 1973, § 14–102. 387 A.2d at 1087 n.5.

In the factual setting of *Lofty,* the trial court's failure to give a cautionary instruction created a substantial likelihood of prejudice to the defendant. In that case the government's substantive evidence against the defendant was not especially strong, and likely was bolstered considerably by the introduction of the witness' inconsistent pretrial statement. In those circumstances the court sua sponte should caution the jury as to the statement's limited admissibility, so that the jury does not improperly consider the statement as substantive evidence.

■ Such are the circumstances as well in the case at bar. We conclude that there was a substantial likelihood of prejudice to appellant arising from the jury's likely improper consideration of the impeaching statement as substantive evidence, given the knowledge that Hunter already had been convicted of participation in the same incident. Thus, to expose the jury to the substance of this witness' inculpatory prior statement without an immediate cautionary instruction amounted in this case to plain error. We so conclude because we cannot say with fair assurance, from the whole of the record before us, that the jury verdict was not substantially swayed by the error. Therefore, "it is impossible to conclude that substantial rights were not affected," and so the error was not harmless. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).[6]

---

6. In so holding, we recognize that in a different factual setting a trial court's failure to give sua sponte a cautionary instruction when a party seeks to impeach its own witness by means of

a prior inconsistent statement may not amount to plain error. *See Dobson v. United States,* D.C.App., 426 A.2d 361, 366 n.9 (1981); D.C. Code 1973, § 11–721(e) (codification of harm-

The government advances two arguments in an attempt to cure what we find to have been reversible error. First, it is argued, the witness (Hunter) affirmed the truth of his prior statement under questioning by the prosecutor. The statement thereby was transformed into substantive evidence to be considered with all the other evidence elicited at trial, retrospectively eliminating the need for the limiting instruction. Were the record truly to reflect the witness' adoption at trial of his previous statement, there would be merit in the government's argument. *Watts v. United States, supra*, 362 A.2d at 711–12 n.11. Here, however, an objective reading of the record does not support the government's position. It is clear that the witness (aside from a single seemingly inconsistent response) steadfastly denied at trial the truth of his prior statement.

The government also argues that there no longer was any need for a cautionary statement once the defense "opened the door" on the source of the witness' prior inconsistent statement and the prosecution followed through to elicit further information on what the witness had heard. It is claimed that in this way the witness' prior statement was removed retroactively from the category of evidence admitted only for its impeachment value. The government cites no authority for this proposition, and we think it to be without merit.[7]

## IV

Having determined to reverse appellant's convictions on the basis of plain error, we nevertheless find it appropriate to reach the merits of appellant's challenges to the trial court's rulings on the suppression of identification evidence. While we assiduously avoid rendering advisory opinions, here we must decide the identification challenges raised, for otherwise on remand the trial court will be obliged to follow the original trial court's pretrial rulings with every expectation that the same matters will be raised on appeal yet another time in the event of conviction on retrial.

We conclude that any imperfections in the identification processes did not amount to a due process violation. *See Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). We agree with the trial court that there was not sufficient suggestivity in the identification procedures so as to raise the spectre of a very substantial likelihood of misidentification. Accordingly, we affirm the ruling made by the trial judge at the suppression hearing.

■ Appellant first challenges the photo array identification by the witness Singleterry. Appellant points to Detective Wood's apparent suggestion to Singleterry to pick out two subjects—the implication being that the police officer was telling the witness that the police believed photos of both assailants were included in the array. Assuming Detective Wood did so instruct Sin-

---

less error rule). We shall evaluate the likelihood of prejudice arising from such a defect on a case-by-case basis. *Johnson v. United States, supra*, 387 A.2d at 1088; *Dixon v. United States, supra*, 287 A.2d at 98. *See also Watts v. United States, supra*, 362 A.2d at 711–12 n.11.

**7.** As a separate matter, appellant contends that the trial judge improperly allowed the prosecutor to elicit from Hunter on redirect examination (over appellant's objection) hearsay details of what the "guys off the street," including Battle, had told him. In this way the government was able to introduce for the second time before the jury virtually the whole prior state-

ment of the witness. The government asserts that once defense counsel drew from Hunter that he got the information given to police earlier "off the street," the door had been opened for the prosecutor to inquire from whom Hunter got his information, and what in particular he had been told. The government cites *Adams v. United States, supra*, for this proposition.

As we have decided to reverse on the basis of the fact that the trial court did not give an immediate cautionary instruction after allowing the jury to hear the substance of the prior statement for the first time, it is not necessary for us to resolve this hearsay question.

gleterry, such words are insufficient to give rise to a substantial likelihood of misidentification. *Simmons v. United States, supra,* 390 U.S. at 383–84, 88 S.Ct. at 970–71. Those words would not have focused the witness' attention on any particular photos in the array, and there is no suggestion that the officer did so in any other way. On his own, the witness picked out appellant and one other man—stating that he was sure of appellant and not so sure of the other identification. We repeatedly have recognized that pretrial identification procedures, including photo arrays, are inherently somewhat suggestive without being violative of due process. A witness may reasonably assume (and indeed would be foolish not to assume) that at least someone in a photo array (or in a lineup) is a suspect. *Marshall v. United States,* D.C.App., 340 A.2d 805 (1975).

Any suggestivity in Detective Wood's remark was insufficient to overcome the independent evidence supporting the reliability of Singleterry's identification of appellant. *Manson v. Brathwaite, supra; Neil v. Biggers, supra.* Whatever question there may be about the weight to be accorded the photo identification (as well as that at the lineup) is properly illuminated by cross-examination at trial. *Simmons v. United States, supra,* 390 U.S. at 384, 88 S.Ct. at 971.

■ Next appellant challenges certain aspects of the lineup at which one of the victims (Paez) and an eyewitness (Singleterry) were able to make identifications of appellant that were introduced at trial. Initially, appellant points to the lack of certainty with which both identifications were made. Paez proceeded by a process of elimination, and then positively identified appellant largely by his peculiar body movements. Singleterry also used a process of elimination, and made identification of appellant and one other man. Appellant's position amounts to an argument that the witnesses had inadequate opportunities to view the assailants, and so any subsequent identifications must be suspect. However, such a claim does not rise to the level of a

due process violation and is properly raised at trial, given the finding of no undue suggestivity in the lineup proceeding itself.

■ Appellant advances several challenges to the lineup. It is claimed that identification by elimination was facilitated impermissibly by the placement of six or seven obviously older subjects in a lineup of ten people, when both eyewitnesses previously had informed the police that the assailants were very young. The trial court found, on the basis of its study of photographs of the lineup, that, in the totality of the circumstances, the lineup was not impermissibly suggestive so as to render the identification unreliable. After viewing a photograph of the lineup, we conclude that the trial court did not thus err. *Manson v. Brathwaite, supra; Neil v. Biggers, supra; Stovall v. Denno, supra; Clemons v. United States,* 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968) (en banc), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

■ Also challenged are the following features of the lineup: the use of some obviously taller and heavier subjects, as well as some with facial hair; appellant's position (with one other subject) in the middle of the line of ten; appellant's being assigned identification shield number 1; and appellant's wearing a white tee-shirt. We find no merit in any of those arguments, and maintain the view that under the totality of circumstances the lineup was not so suggestive as to constitute a violation of due process. *Anderson v. United States,* D.C.App., 364 A.2d 143 (1976).

■ Appellant argues that there was undue suggestivity in the fact that he was identified by Singleterry in a photo array and then appeared in the lineup—at which time Singleterry again identified him (and after which a police officer apparently told Singleterry that appellant was a prime suspect). There is, of course, a degree of suggestivity in such a progression of pretrial events, but there is no merit to the claim that the pretrial identification proceedings were designed to cause, or had the effect of causing, an identification of appellant

where there was in reality no basis for a valid identification. *Fludd v. United States*, D.C.App., 336 A.2d 539 (1975); *Washington v. United States*, D.C.App., 334 A.2d 185 (1975); *United States v. Person*, 155 U.S.App.D.C. 455, 478 F.2d 659 (1973); *United States v. Sanders*, 322 F.Supp. 947 (E.D.Pa.1971), aff'd, 459 F.2d 86 (3d Cir.), cert. denied, 409 U.S. 860, 93 S.Ct. 146, 34 L.Ed.2d 106 (1972). In so concluding, we are not insensitive to the fact that in some cases the combined circumstances may give rise to a degree of impermissible suggestivity which is violative of due process. *See, e. g., United States v. Gambrill*, 146 U.S.App. D.C. 72, 449 F.2d 1148 (1971).

▮▮▮▮▮ At the suppression hearing the court refused to allow appellant to introduce certain evidence allegedly bearing on the issue of suggestivity. The nature of this proffered evidence has been outlined above. The trial judge enjoys broad discretion in such matters, and we will overturn an exercise of that discretion only upon a finding of abuse. *Randall v. United States*, D.C.App., 353 A.2d 12, 14 (1976); *Hardy v. United States*, 118 U.S.App.D.C. 253, 254, 335 F.2d 288, 289 (1964). We detect no abuse of discretion here. On the contrary, the court's rulings on the proffers of evidence seem to us eminently reasonable.

▮▮▮ Finally, appellant asks us to apply the rule announced in *Singletary v. United States*, D.C.App., 383 A.2d 1064 (1978), retroactively to the facts of this case and find that appellant's forced presence at the suppression hearing resulted in a substantial possibility of prejudice to defendant's rights and thus constituted reversible error. We note the following conclusion of the *Singletary* court:

> [T]he defendant does have a right to waive his presence at a pretrial suppression hearing in a case such as this in which no legitimate interests of the government or of the defendant would have been prejudiced by the defendant's absence; however, on the record in this case reversal is not appropriate. [383 A.2d at 1070.]

We decline to make a determination of the possibility of prejudice in this case because of our conclusion that the *Singletary* rule is not to be applied retroactively. (The suppression hearing in the case at bar was held almost a year before *Singletary* was decided.) We do not feel that this is the type of defect which the Supreme Court was addressing when it explained its exceptional practice of retroactively applying "rules of criminal procedure fashioned to correct serious flaws in the fact-finding process at trial." *Stovall v. Denno, supra*, 388 U.S. at 298, 87 S.Ct. at 1970. (In *Stovall*, the Court refused to apply retroactively the exclusionary rule requiring the presence of defense counsel at a post-indictment lineup.)

V

For the foregoing reasons, while we affirm the rulings of the trial court on the speedy trial and suppression issues, we find that the failure to give a cautionary instruction as to the use of impeachment testimony, although no such instruction was requested by defense counsel, on the facts of this case did reach the level of plain error. Accordingly, we set aside the convictions and remand the case for further proceedings.

*Reversed and remanded.*

NEWMAN, Chief Judge, concurring:

I join the opinion of Judge Harris except for Part III. Whether, on the one hand, one reads footnote 5 of *Johnson v. United States*, D.C.App., 387 A.2d 1084 (1978) (en banc), as reaffirming a per se reversal rule where the government impeaches its own witness with a prior inconsistent statement and the court fails to give a limiting instruction, *sua sponte*, or, on the other hand, as Judge Harris does, that such a failure must be evaluated under the plain error regime of *Watts v. United States*, D.C.App., 362 A.2d 706 (1976) (en banc), we are in agreement that this conviction must be reversed.

KELLY, J., concurs in the result only.