**William S. SCHWASTA, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 12826.

District of Columbia Court of Appeals.

Submitted July 11, 1978.

Decided Oct. 23, 1978.

Nicolas M. W. DiBella, Washington, D. C., appointed by the court, was on brief, for appellant.

Earl J. Silbert, U. S. Atty. and John A. Terry and Richard W. Hausler, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and KERN and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellant was convicted in a bench trial of possession of marijuana. D.C.Code 1973, § 33–402. He contends that the evidence on which his conviction was based was the product of an unconstitutional search and seizure, and hence that the trial court committed reversible error in denying his motion to suppress the evidence. We affirm appellant's conviction. However, we remand the case for resentencing.

I

The trial court accepted the version of the incident presented by the only witness—Officer Albert Rivera of the Metropolitan Police Department. Officer Rivera testified that he saw appellant drive a motorcycle through a red light while traveling at a high rate of speed. Officer Rivera pursued appellant with his cruiser's emergency lights and siren in operation. After an extended chase, the officer finally stopped appellant and arrested him for reckless driving.

As the two awaited a police transport, appellant told Officer Rivera that "he did not want his motorcycle left there because he had some valuable items in there." When appellant was transported to the station, another officer drove the motorcycle to the station's parking lot for possible impoundment. While it was being determined whether appellant would be released or detained overnight, Officer Rivera located the motorcycle in the parking lot and lifted the cover of the left saddlebag, which was unlocked. There he found six clear plastic bags and two rolled cigarettes, all containing a greenish-brown substance which proved to be marijuana. In the right saddlebag he found a "take-apart .22 caliber rifle and some ammunition for it." Officer Rivera stated his reason for looking into the saddlebags as follows:

> At this point because Mr. Schwasta had stated that he had some valuable items in the back of his motorcycle in the saddlebags, I decided to check it out because I don't want to have any claims against me if anything—if Mr. Schwasta came back to his motorcycle and might have said that he was missing items, especially valuable items.

The trial court denied the motion to suppress the evidence, concluding that the offi-

cer's search of the saddlebags was reasonable in view of appellant's statement that there were valuables in them. The court found that Officer Rivera was acting in good faith to insure the safekeeping of any valuables he might find. The court also ruled that for Fourth Amendment purposes, a distinction exists between unlocked motorcycle saddlebags and a locked automobile.

At a later trial in which the facts were stipulated, appellant was convicted of possession of marijuana.

## II

Whether such a search of a motorcycle is reasonable under the Fourth Amendment is a question of first impression for this court. However, numerous cases have addressed the question of the reasonableness of an automobile search, and we draw from those cases in resolving the issue.

The Supreme Court traditionally has drawn a distinction between automobiles and homes or offices in the context of the Fourth Amendment. "[W]arrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not." *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976) [hereinafter *Opperman*]. *Accord, Cardwell v. Lewis,* 417 U.S. 583, 589–90, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Cady v. Dombrowski,* 413 U.S. 433, 439–40, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Chambers v. Maroney,* 399 U.S. 42, 48–49, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Patterson v. United States,* D.C. App., 301 A.2d 67, 70 (1973). The Court has articulated two well-recognized justifications for this distinction. First, automobiles, unlike dwellings or other structures, "can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925), *quoted in Coolidge v. New Hampshire,* 403 U.S. 443, 459–60, 91 S.Ct. 2022, 2034, 29 L.Ed.2d 564 (1971). Second, "the expectation of privacy with respect to one's automobile is significantly less than that relat-

ing to one's home or office." *Opperman, supra,* 428 U.S., at 367, 96 S.Ct., at 3096 (footnote omitted).

In explaining the latter justification for the distinction, the Court mentioned several relevant factors in *Opperman.* Law enforcement officers frequently are brought into contact with automobiles on a noncriminal basis. *See Cady v. Dombrowski, supra,* 413 U.S. at 441, 93 S.Ct. 2523. "Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements." *Opperman, supra,* 428 U.S., at 368, 96 S.Ct. at 3096. Automobile travel is inherently public in that it involves travel on public roads in which both the occupants and the unconcealed contents of the vehicle are in plain view. Further, the police have the authority to remove from the streets and impound illegally parked automobiles which jeopardize the public safety and the efficient movement of vehicular traffic.

■ Those justifications for treating an automobile differently from a house or an office in the context of the Fourth Amendment apply equally when a motorcycle is the vehicle searched. Motorcycles can easily be removed from the jurisdiction before a warrant can be sought. Further, the expectation of privacy of the rider of a motorcycle certainly is no greater than that of the occupant of an automobile, since the rider is at least as exposed to public view as are the occupants of an automobile. In addition, motorcycles are subject to the same pervasive and continuing governmental regulation and controls as automobiles, including being subject to police impoundment when parked illegally.

■ The Supreme Court noted in *Opperman* that when automobiles are impounded, the police generally follow established departmental procedures for securing and inventorying the vehicle's contents. Such procedures are designed to meet three distinct needs: (1) the protection of the owner's property while it remains in police custody; (2) the protection of the police

against claims or disputes over lost or stolen property, and (3) the protection of the police from potential danger. 428 U.S. at 369, 96 S.Ct. 3092. The *Opperman* Court noted that "inventories pursuant to standard police procedures" which are designed to meet these needs of the owner and the police are reasonable for purposes of the Fourth Amendment.[1] *Id.,* at 372, 96 S.Ct. at 3098. Implicit in the Court's holding was the further requirement that the inventory take place after the police lawfully have acquired custody of the vehicle. *Arrington v. United States,* D.C.App., 382 A.2d 14, 18 (1978). *See, e. g., Harris v. United States,* 390 U.S. 234, 236–37, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) (Douglas, J., concurring); *Preston v. United States,* 376 U.S. 364, 368, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); *Pigford v. United States,* D.C.App., 273 A.2d 837, 839 (1971).

Applying these principles here, a proper resolution of this case requires us to address two questions: (1) Was the motorcycle lawfully possessed by the police?; and (2) was the inventory search procedure conducted by the police pursuant to standard police procedures properly designed to meet the three above-mentioned needs?

We previously have been faced with the question of whether a motor vehicle which was searched by the police at the station house was lawfully in their possession. In *United States v. Pannell,* D.C.App., 256 A.2d 925 (1969), we affirmed the suppression of narcotics paraphernalia which were seized from a defendant's automobile on the parking lot of a police station after he had been arrested and taken there for booking on the charge of driving without a valid permit. Following his arrest, Pannell had driven his automobile to the station lot at the direction of the police. It was impounded shortly thereafter. We noted that the automobile had not been impounded either as evidence or pursuant to a statute forfeiting automobiles used for specific illicit purposes, as was true in the cases relied upon by the government. The only justification offered by the police for the impoundment was that Pannell had no one available to remove his car from the precinct lot "within a reasonable time." That justification was undermined, however, by the fact that Pannell had advised the officers that he did have someone who could come for the car after work. We also found it significant that: (1) the decision to impound the automobile was made after the police learned that Pannell had lost his license because of prior narcotics use; and (2) the search was conducted before he had been booked for the traffic offense for which he had been arrested. Under those circumstances, we held that the police had no valid reason to impound Pannell's car and that the search therefore was impermissible.

In *Mayfield v. United States,* D.C.App., 276 A.2d 123 (1971), we also relied on the requirement of lawful police possession of an automobile prior to a station house search in reversing the trial court's admission of evidence seized during such a search. In *Mayfield,* the appellant, driving with two friends in a downtown area, was stopped by a police officer and asked to produce his license and registration. When the officer saw a stamped notation on the permit reflecting a suspension, he arrested Mayfield for operating a motor vehicle without a valid license. Mayfield was driven to the police station, booked, and detained due to his inability to post collateral. Meanwhile, it having been determined that the other occupants of the car were without valid driving permits, another officer drove appellant's automobile to the station. The

---

1. The Court's concern that the search take place pursuant to standard police procedures undoubtedly reflects a desire to protect individuals from being singled out by the police for special treatment. As the Ninth Circuit noted in *United States v. Hellman,* 556 F.2d 442 (9th Cir. 1977):

> A locally followed practice gives some assurance that a particular car was not singled out

for special searching attention. Absent such assurance some special reason for the taking of safeguarding or security precautions that are not customarily taken should exist if the intrusion resulting from the taking of such precautions is to be rendered reasonable under the fourth amendment. [*Id.,* at 444 (footnote omitted).]

police impounded it, searched it, and made an inventory of its contents. One of the items discovered was a brown envelope which contained marijuana. In addressing the propriety of the impoundment of the car, we stated:

> This court . . . in situations where the search has occurred in a parking area contiguous to a police station while the accused is inside the building being booked on a traffic charge (which is the case here) has consistently held that resort to impoundment procedure does not make admissible—at least for the prosecution of wholly different offenses—articles thereby uncovered which would be otherwise inadmissible on fourth amendment principles. [*Id.*, at 125.]

We rejected the argument that the temporary absence of the driver from his vehicle while he was being booked, without more, was a legally sufficient reason for the police to take possession of the automobile in order to perform an inventory search.

Recently, in *Arrington v. United States, supra,* we reiterated the requirement of lawful police possession of the automobile in reversing convictions due to the erroneous admission of evidence seized during an unconstitutional search. In *Arrington*, a police officer had seen that appellant in an automobile stopped abreast of a parked car. After ordering Arrington to drive around the corner, the officer conducted a WALES check.[2] When he discovered that Arrington's driver's license had been suspended, he placed him under arrest for driving on a suspended permit. The officer then noticed a brown bag partially protruding from under the passenger seat. Arrington was transported in a police vehicle to the station, and his car was driven there by the arresting officer. Upon reaching the sta-

tion, the officer removed the bag from under the seat and examined its contents. Finding credit cards and other documents bearing the names of two women, the officer searched the glove compartment and found other incriminating items. In determining whether the inventory search was proper, we concluded that the police may properly impound a motor vehicle as prisoner property only when the prisoner consents thereto or is unable to make other arrangements for its disposition.[3] Finding no evidence of either Arrington's consent or his inability to provide for the disposition of his car, we held that the impoundment, and thus the subsequent inventory search, were unconstitutional.[4]

Turning from those precedents to this case, we conclude that the police acted properly in impounding appellant's motorcycle. The police were not faced here, as they were in *Pannell, Mayfield,* and *Arrington,* with only the temporary absence of the driver from the vehicle while he was being booked, as a justification for the impoundment. Although not amounting to an explicit request for the police to impound the motorcycle, appellant's statement to Officer Rivera that "he did not want his motorcycle left there because he had some valuable items in there" certainly implied as a minimum that appellant had no objection to such protective action being taken by the police. We conclude that appellant's statement constituted sufficient evidence of consent to justify the impounding.

We now consider whether the inventory search was conducted pursuant to standard police procedures designed to meet the needs identified by the Supreme Court in *Opperman.* There is no specific provision of the Metropolitan Police Department Regulations dealing with motorcycles.

---

**2.** WALES is a computer system containing information pertinent to law enforcement.

**3.** Other justifications for police impoundment of a vehicle applicable neither to *Arrington* nor this case are (1) the existence of a state statute forfeiting to the state cars used for illegal purposes, *see Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), and (2) a reasonable belief that the vehicle constitutes

evidence of a crime, *see Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

**4.** In *Arrington* we also rejected the government's alternative arguments that the search was justified as being (1) based on probable cause, or (2) incident to a lawful arrest. The government makes no such alternative arguments here.

However, Metropolitan Police Department General Order, Series 602, No. 1 (Effective May 26, 1972), established guidelines for the protection, classification, and inventory of "[a]utomobiles coming into the custody of the police department." *Id.*, at § I–B. Section I–B(3) covers the vehicle of a person "arrested in an automobile which he owns or has been authorized to use." That section classifies such a vehicle as "prisoner's property" and requires that it "be disposed of in any lawful manner in which the person arrested directs." *Id.*, § I–B(3)(a). If the person arrested requests that the police take possession of the vehicle, then

> [i]mmediately upon arrival at the police facility [*i. e.*, before impoundment] the arresting officer shall remove from the passenger compartment of the vehicle any personal property which can easily be seen from outside the vehicle and which reasonably has a value in excess of $25. After removing such property, if any, the officer shall make sure that the windows are rolled up and the doors and trunk are locked. Any property so removed shall be brought into the police facility and appropriate entries and returns made . . . .. No other inventory or search of the vehicle shall be made at this time. [*Id.*, § I–B(3)(b).]

▮ We conclude that Officer Rivera's search of the saddlebags for valuables constituted a reasonable application of § I–B(3) to a motorcycle which was lawfully possessed by the police. The unlocked saddlebags were equivalent to the passenger compartment of an unlocked automobile from which personal property easily could be removed by others. The search was limited to the saddlebags. While the contents could not readily be seen, Officer Rivera had been told that they contained valuables.

Under these circumstances, it was not unreasonable to conduct a limited search of the places from which valuables easily could be removed. The search thus was conducted pursuant to the standard procedures which most closely fit such a situation.[5]

▮ We have noted the requirement under *Opperman* that the standard procedures pursuant to which a search is made must be designed to protect (1) the owner's property while it remains in police custody; (2) the police against possible claims or disputes over lost or stolen property; and (3) the police from potential danger. The procedures established by § I–B(3) of General Order 602 provide a wholly reasonable method of accomplishing these goals. A limited search pursuant to this section of areas of a vehicle from which a prisoner's valuables could be removed is designed to safeguard the prisoner's property during the time he is in custody. *See Mayfield v. United States, supra*, at 125; *United States v. Fuller*, 277 F.Supp. 97, 99–100 (D.D.C. 1967). By seizing a prisoner's property and marking it, the police also protect themselves against a later claim by the prisoner that they have lost or stolen the property. *See Mayfield v. United States, supra*, at 125. Additionally, the removal of firearms from areas of the vehicle which are easily accessible furthers the goal of protecting the police and the public from potential danger. *See Opperman, supra*, 428 U.S. at 376 n.10, 96 S.Ct. 3092.

The motions judge found that the purpose of the search was "to insure safekeeping" of appellant's valuables and that the search was "just a precautionary measure to protect the police with respect to any valuables." He added: "I have no reason to believe that [Officer Rivera] was looking

---

5. Furthermore, we note that in *Opperman* the Supreme Court approved as "not unreasonable in scope" an inventory search which included the opening of an unlocked glove compartment "to which vandals would have had ready and unobstructed access once inside the car." *Opperman, supra*, at 376 n.10, 96 S.Ct. 3100. The Court approved the search of the glove compartment even though the applicable South Dakota regulation did not specifically sanction

such a search. [The regulation provided that: "A gratuitous depository must use at least slight care for the preservation of the thing deposited." *See State v. Opperman*, 228 N.W.2d 152, 159 (S.D.1975).] Under the circumstances of this case, the search of the unlocked saddlebags served to protect the interests cited by the Supreme Court as a justification for the search of the unlocked glove compartment in *Opperman*.

for anything else [in which case] a good faith [question] would come in." Officer Rivera's search, therefore, is distinguishable from the police searches which we condemned as exploratory in *United States v. Pannell, supra,* and *Pigford v. United States, supra.* Finding that both § I–B(3) of General Order 602 and the search of the saddlebags conducted pursuant to it reflect a Metropolitan Police Department goal of fulfilling, through limited inventory searches, the needs found desirable by the Supreme Court in *Opperman, supra,* we affirm the denial of the motion to suppress the marijuana.

### III

The trial court suspended the imposition of sentence and placed appellant on probation for six months. The government contends that the trial court had no authority to impose such a sentence. The government did not note an appeal, and hence it may not advance as erroneous any action taken in the case by the trial court. *See, e. g., Strunk v. United States,* 412 U.S. 434, 437, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1976). However, we take judicial notice of the fact that the sentencing technique utilized in this case is not uncommon, and hence the matter warrants our attention as part of the exercise of our supervisory jurisdiction.

It is well settled that a sentencing court has no authority to suspend a sentence or to impose a sentence of a nature or in a manner not authorized by statute. *See, e. g., Ex parte United States,* 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916). The statute upon which the trial court might have relied as authority for placing appellant on probation after suspending the imposition of sentence is the Federal Probation Act, 18 U.S.C. § 3651 (1970). However, we have held that Act not to apply to the Superior Court. *See Sanker v. United States,* D.C.App., 374 A.2d 304 (1977). The appropriate controlling statute is D.C.Code 1973, § 16–710, which permits the trial court to grant probation only after it has imposed a sentence and suspended its execution.[6] Hence, although appellant already has completed his period of probation, the record now reflects that no sentence yet has been imposed. Accordingly, while we affirm the judgment of conviction, we set aside the Judgment and Probation Order and remand the case for resentencing in accordance with § 16–710.[7]

*Affirmed in part, vacated in part, and remanded.*

---

**6.** Section 16–710 provides in pertinent part:

In criminal cases in the Superior Court of the District of Columbia, the court may, upon conviction, suspend the imposition of sentence or impose sentence and suspend the execution thereof, for such time and upon such terms as it deems best, if it appears to the satisfaction of the court that the ends of justice and the best interests of the defendant would be served thereby. In each case of the imposition of sentence and the suspension of the execution thereof, the court may place the defendant on probation under the control and supervision of a probation officer.

**7.** We note that the standard Judgment and Probation Order form which is utilized by the Su-

perior Court has been designed correctly to reflect the imposition of a sentence and the suspension of the execution thereof to provide for probation. Here, the trial court modified the language of the printed form to suspend the imposition of sentence rather than the execution thereof.

We note further that in *Huffman v. United States,* D.C.App., 259 A.2d 342, 346 (1969), we suggested that a defendant may be placed on probation when the imposition of a sentence is suspended. However, that question was not before the court in *Huffman,* and the relevant dictum therein does not preclude our reaching the result which we do in this case.