Brandon G. BEALE, Appellant,

v.

UNITED STATES, Appellee.

No. 81–614.

District of Columbia Court of Appeals.

Argued Aug. 24, 1982.

Decided June 20, 1983.

James M. Fallon, Washington, D.C., appointed by this court, for appellant.

Sylvia Royce, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., John A. Terry, Asst. U.S. Atty., at the time brief was filed, and David W. Stanley, Asst. U.S. Atty., Washington, D.C., were on brief, for appellee.

Before KERN, NEBEKER and MACK, Associate Judges.

KERN, Associate Judge:

After a jury trial, appellant was convicted of first-degree premeditated murder while armed in violation of D.C.Code §§ 22–2401, 3202 (1981), and carrying a pistol without a license in violation of D.C. Code, § 22–3204 (1981). He was sentenced to concurrent terms of 20 years to life imprisonment for murder and one year imprisonment for carrying a pistol without a license.

On appeal, he raises a spectrum of issues and alleges several instances of improper prosecutorial conduct, erroneous trial court rulings on evidentiary matters and trial court error in refusing to consider probation as a sentencing alternative.[1] Although we do not find the trial proceedings to be without error, we affirm appellant's conviction because we are persuaded that any errors that were committed could not have substantially swayed the judgment of the jury.

---

1. Appellant also raises several issues concerning a judgment which was entered against him by the trial court for contempt. A party must file a notice of appeal in a criminal case "within ten days after entry of the judgment or order from which the appeal is taken." D.C.App.R. 4 II(b)(4). The Clerk of Superior Court entered the notation of a judgment for contempt on the criminal docket on January 29, 1981. (Record at 68.) The notice of appeal in this case was filed on May 1, 1981. (Record at 69.) Thus, we are without jurisdiction to consider appellant's claims concerning this judgment.

Appellant claims that his motion for reconsideration filed on February 4, 1981, tolled the time for filing a notice of appeal. This claim is without merit. *See In re Alexander*, 428 A.2d 812 (D.C.1981).

At approximately 10:30 p.m. on the night of August 2, 1980, Donald Thompson was shot in the vicinity of 1412 Chapin Street, N.W. At a subsequent trial, the government presented the testimony of three witnesses (Peggy Ann Williams, George Roper and Michelle Mason) who stated that they saw appellant shoot Thompson. The defense called eight witnesses who testified either that they did not see appellant in the area at the time of the murder or that they saw the shooting but appellant was not the perpetrator. Appellant testified, as did his brother Raymond and girl friend Tanya, that he was at home during the crucial time. Appellant stated to the jury that after learning that he was wanted by the police, he turned himself in accompanied by counsel.

## I

Appellant claims that the trial court erred during trial in permitting the prosecutor to impeach, variously, three defense witnesses by reference to police records or prior arrests and convictions.

First, the government called as a witness Detective Joseph E. Schwartz, who attempted to find appellant after he was identified as a suspect in the Thompson murder. Schwartz testified that when he appeared at an apartment in 1412 Chapin Street, N.W., he encountered several individuals who would not identify themselves, although he was able to later identify one of them, Raymond Beale, through "criminal records."[2] Defense counsel objected and moved for a mistrial. (Record at 372.)

■ The decision on whether a mistrial should be declared has always been committed to the sound discretion of the trial court. *Middleton v. United States*, 401 A.2d

109, 127 (D.C.1979); *United States v. Anderson*, 165 U.S.App.D.C. 390, 403, 509 F.2d 312, 325 (1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975). As such, on appeal, a decision should be reversed only in extreme situations threatening a miscarriage of justice. *Middleton, supra.*

■ Appellant contends that the words of Detective Schwartz "could only be taken to mean that he had either prior arrests or convictions" (Appellant's Brief at 8) and that the trial court failed to mitigate the error. Under the facts and circumstances of this case, we are not persuaded that the trial court abused its discretion.

The officer's reference to "criminal records" was a passing reference in the course of a lengthy trial which does not serve to directly rebut appellant's alibi defense. Further, any prejudicial impact of Detective Schwartz's comment could have easily been cured by an immediate cautionary instruction to the jury *which was refused by defense counsel* despite the trial court's continuing reminders during the trial of the availability of such an option.[3] We contrast the situation here with that in *Lucas v. United States*, 436 A.2d 1282 (D.C.1981), which appellant asserts is virtually the same as the present case. There, a prior inconsistent statement was used to impeach the defendant's brother which "if considered for the truth of its content [would have] rebutted [the defendant's] alibi defense [and] supported [his] statement to police which he had repudiated." *Id.* at 1285. This, coupled with the prosecutor's closing argument to the jury which the court found to be arguing the substantive truth of the prior inconsistent statement,

2. More specifically, the testimony was as follows:

Q. Have you since learned the identity of the unidentified male subject that was in Apartment 37 at 1412 Chapin Street that night?
A. I did.
Q. When you were looking for Brandon Beale. Who was that person?

A. Mr. Raymond Beale, Brandon's brother.
Q. How did you learn his identity?
A. I—through criminal records. I found his police record, and I was able to obtain a photograph. [Record at 371–72.]

3. *See* Record at 373, 375, 801–02, 963–66.

led the court to find that the defendant was denied his right to a fair trial.[4]

Second, on *direct* examination, defense witness Robert Ellis was questioned by appellant's counsel as follows:

Q. You've been con—have you been convicted of some misdemeanors?

A. Yes, I have.

Q. What were they?

A. Selling liquor without a license, carrying a pistol without a license, and UNA.

Q. What is UNA?

A. Uniform Narcotic Act, one nickle bag of reefer.

Q. Is that marijuana?

A. Yes.

Q. Were those within the past ten years?

A. Yes it is. [Record at 570–71.]

On cross examination, the prosecutor brought up these three prior convictions and asked a total of four questions confirming the dates of these convictions.

In *Kitt v. United States,* 379 A.2d 973, 975 (D.C.1977), this court held that the trial court must permit either side to bring out the criminal convictions of its own witnesses on direct examination in order to "draw the sting from the inevitable impeachment on cross-examination." Such a rule was designed to allow the defense to defuse the effect of a prior conviction by having the witness "tell it on himself." Appellant's assertion is that a prosecutor is foreclosed from introducing prior convictions *after* the defense has conducted an effective *Kitt* inquiry; but, contrary to appellant's assertion, *Kitt* recognizes a right by the prosecutor to probe on cross-examination. We said that "irrespective of which side introduces such evidence, the government remains free to argue its significance as to the witness' credibility." 379 A.2d at 975 n. 2. In sum, the purpose of a *Kitt* inquiry is to defuse, not foreclose, the prosecution's impeachment.[5] As such, the prosecution's cross-examination of Robert Ellis was proper and the trial court did not err in overruling appellant's objection.[6]

Finally, appellant also claims that the trial court erred in not striking a reference made by Detective Schwartz on redirect examination that an announced defense witness was "wanted by the police." On cross-examination of Detective Schwartz, defense counsel sought to develop a defense theory that the police never fully investigated the case by asking the detective whether he had interviewed a certain list of individuals. In response to this series of questions, Schwartz responded that he had not been able to interview a person named Curtis Coleman on that list who was a fugitive. (Record at 392–93.)

The "scope of redirect examination rest[s] within the sound judicial discretion of the

---

4. Appellant also argued that the prosecutor displayed the photograph from the police records to the jury. The trial judge addressed defense counsel's concerns and specifically refuted counsel's claim:

 THE COURT: It could not have been seen by a member of the jury, from where the Court sat, that's a clear cut fact. [Record at 606–07.]

5. We note in passing that the trial court has discretion to limit evidence which is unduly cumulative in nature. Such is not the case here.

6. Appellant raises two additional points concerning the prosecutor's treatment of the defense witness Robert Ellis. First, appellant claims that the prosecutor should not have been able to question him about his marijuana use and should not have referred to him in closing argument as a "drug pusher." The witness had a recent drug-related conviction and had admitted during cross examination that he had sold drugs. As such, the government did not act improperly when it sought to inquire whether the witness' ability to observe had been impaired by the use of drugs, and the government's comments during closing argument were fair comments on the evidence.

 Second, appellant claims that the trial court erred by allowing the government to elicit testimony from Ellis concerning his appearance as a witness in a child abuse case. As the government points out, the testimony did not in any way reflect adversely either on Ellis or appellant, and thus its inclusion, even if erroneous, was harmless.

trial court and will not be reversed unless there is a clear showing of abuse of discretion." *In re D.S.A.,* 283 A.2d 829, 831 (D.C. 1971); *cf.* FED.R.EVID. 611(a). Since appellant initiated the questioning concerning Curtis Coleman on cross-examination, the trial court did not abuse its discretion in allowing the prosecutor as part of his redirect examination to obtain the reason why the detective did not interview Curtis Coleman.

## II

■ Appellant raises several additional arguments concerning alleged improper impeachment of witnesses by the government at trial. First, appellant claims that the trial court erred by permitting the prosecutor to impeach a defense witness with a prior inconsistent statement without laying a proper foundation. The record reflects that defense counsel did not raise this precise objection below, and thus this claim must be judged under the plain error standard.[7] Under that standard, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial. *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976).

During its case in chief, the government called Michelle Mason who testified that on the night of the shooting, she saw appellant step out from a hallway at 1412 Chapin Street, N.W., and shoot the victim Donald Thompson. (Record at 235–39.) Defense counsel called Vernell Mason, the ten-year-old niece of Michelle Mason, to the stand. She testified that there was no man in the hallway and that appellant was not seen that night. (Record at 519–24.) On cross-examination, the government questioned Vernell as follows:

Q. Did your mother or anyone ever tell you that it would be better for you if you claim not to know anything about what happened that night?

A. Nobody talked to me about that.

Q. Nobody ever talked to you about that?

A. No. (Record at 529–30.)

On rebuttal, the government recalled Michelle Mason, who testified as to a conversation held prior to trial with Vernell. Then, according to the rebuttal testimony, Vernell said that her mother had told her to say nothing to the police and, if asked by them to state what happened, to tell them "she didn't see anything." (Record at 949, 951.) The court overruled defense counsel's objection on hearsay grounds since the prosecutor offered such testimony for the impeachment of Vernell's testimony that her mother had *never* told her to claim ignorance of the incident. (Record at 949–50.)

Appellant argues that in order to properly impeach a witness through the use of a prior inconsistent statement, counsel must *first* lay a foundation by directing the attention of the witness to the time, place and circumstances of the prior statement and by asking the witness whether she made it; the witness must also be given the opportunity to explain the prior statement. *United States v. Wright,* 160 U.S.App.D.C. 57, 489 F.2d 1181 (1973); *Gordon v. United States,* 53 U.S.App.D.C. 154, 289 F.2d 552 (1923).

Here, appellant points to the fact that the government in its attempt to impeach the testimony of Vernell Mason did not direct the attention of that witness in a specific enough manner to conform with this established principle of law. Vernell was not apprised of the time, place or specific circumstances surrounding her prior statement to Michelle Mason, nor was she given any chance to explain away the inconsistency. Appellant claims that the error rises out of "a central issue in the case, which was the credibility of Michelle Mason," since Vernell Mason contradicted Michelle's testimony that appellant was at the scene

---

7. The record reflects that defense counsel characterized his objection on four separate occasions as one related to hearsay rather than to improper foundation for use of a prior inconsistent statement. *See* Record at 949–50.

and actually committed the shooting. (Appellant's Brief at 12.)

We conclude that appellant has highlighted this testimony out of its context in the record. Michelle Mason was only one of three eyewitnesses to the shooting presented by the government at trial. Additionally, Vernell Mason was one of 11 defense witnesses, and not one of the witnesses who actually saw the shooting. (Record at 523.) Furthermore, although Vernell Mason was not confronted with the specific circumstances of her prior statement to Michelle Mason, the child did deny having been instructed by her mother to say nothing about the murder indicating that more specific questions would have been pointless. Therefore, in our view, the improper impeachment did not jeopardize the very fairness and integrity of the trial. See Watts, supra.[8]

Appellant also argues that the trial court erred in allowing the government to impeach its own witness, Henry Miller. Miller did not testify at trial as he had testified at voir dire and the prosecutor impeached him with his prior inconsistent statement. (Record at 941–44.)

A party may impeach its own witnesses only after establishing a good faith claim of surprise. Scott v. United States, 412 A.2d 364 (D.C.1980); D.C.Code § 14–102 (1981).[9] Furthermore, this court had

held that immediately after the prosecution has impeached its own witness with the prior statement, the court must give a cautionary instruction advising the jury that the prior statement is admissible only for impeachment; failure to do so has constituted error. See Lucas v. United States, 436 A.2d 1282 (D.C.1981); Towles v. United States, 428 A.2d 836 (D.C.1981).

In the instant case, no objection to this impeachment was made at the trial court level and we are therefore constrained to reverse only upon a finding of plain error affecting substantial rights. Watts, supra. Despite the fact that the prosecutor successfully impeached his own witness without claiming surprise, and the fact that no cautionary instruction was given, we find this case to be factually distinguishable from Lucas and Towles and conclude that the trial court error in allowing the impeachment was harmless.

In Lucas, we found reversible error when the trial court failed to give an immediate cautionary instruction because the prior inconsistent statement made at a grand jury hearing would have rebutted the defendant's main defense theory. We conclude under these circumstances that we could not say "with fair assurance that the jury verdict was not substantially swayed by the error." 436 A.2d at 1285; see also Kotteakos, supra. In Towles, we found plain error

---

8. With respect to the impeachment of defense witnesses, appellant raises two additional issues. First, he objects to what he categorizes as a "blanket impeachment" of his witnesses. The government made references in its trial questioning and closing argument to the neighborhood's unwillingness to cooperate with the police. Appellant claims that such conduct was "inflammatory" and "diverted the jury from the evidence." Appellant's Brief at 23. Since the defense was trying to show that the police did not investigate the case fully, the prosecution's response was reasonable and proper rebuttal argument.

Second, appellant objects to the government's characterization during closing argument about children being "suspect" witnesses. While the word "suspect" may not have been the most appropriate word for the government to use, the prosecution was certainly entitled to remind the jury in argument of the uncertainty

of testimony by children. See Criminal Jury Instructions of the District of Columbia, No. 2.21 (3d ed. 1978).

9. D.C.Code § 14–102 (1981), is as follows:

When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause. Before such proof is given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he made the statements and if so allowed to explain them.

when the jury could have considered as substantive evidence an implicating prior inconsistent statement of a witness already convicted of the crime at issue. 428 A.2d at 843.

 These opinions indicate that the failure of the trial court to instruct the jury as to the limited purpose for the introduction of this sort of impeachment evidence will not amount to plain error in every case. *Towles v. United States, supra,* 428 A.2d at 843 n. 6. Rather, "we must evaluate the degree of error on a case by case basis." *Lucas v. United States, supra,* 436 A.2d at 1285. In the instant case, the impeachment related to a collateral issue rather than to the central issue in the case. Given this circumstance, we conclude that substantial rights were not affected by the absence of a cautionary instruction, and thus the error was harmless. *See Kotteakos, supra.*

### III

The next issue we address is whether the trial court erroneously prohibited defense counsel from introducing evidence tending to connect an individual other than appellant with the commission of the homicide. The defense was prepared to call four witnesses who were allegedly going to testify that other individuals had as much, if not more, of a motive to kill Thompson than appellant had. The trial court ruled that "without a showing of specific testimony to the effect that some of these individuals . . . were seen in the area" on the night of the murder, such evidence would be inadmissible. (Record at 465.)

 The trial court's decision that proffered evidence is not sufficiently relevant or probative is reviewable only for an abuse of discretion. *Randall v. United States,* 353 A.2d 12, 14 (D.C.1976). Evidence that someone other than the accused committed the crime for which the accused is charged may be presented through testimony of defense witnesses when there are sufficient indicia that the evidence is reliable. *Brown v. United States,* 409 A.2d 1093, 1097 (D.C.1979). The evidence must clearly

link the other person to the commission of the crime. *Id.; see also, Commonwealth v. Graziano,* 368 Mass. 325, 331 N.E.2d 808 (1975) ("the evidence should . . . be closely related to the facts of the case against the defendant").

 Here, while counsel made a proffer of the details of prior acts of aggression by the decedent toward persons other than appellant, at no time did he proffer any evidence specifically linking these events to the subsequent murder. (Record at 973–75.) Further, counsel was unable to proffer any evidence that these other individuals, assertedly with motives to kill the victim Thompson, were in the area at the time of the shooting. (Record at 14–15, 17.) Appellant relies upon two cases which are clearly distinguishable from the instant case. In *Commonwealth v. Graziano, supra,* and *State v. Hawkins,* 260 N.W.2d 150 (Minn.1977), clear evidence existed that the other individuals with motive were present at the scene of the murder.

We are persuaded that the trial court did not err in prohibiting the defense from admitting the proffered evidence when such evidence was not closely related to the facts surrounding the crime at issue.

### IV

Appellant argues that "the trial court erred in permitting the prosecutor to argue inferences from appellant's silence while in post-arrest custody." (Appellant's Brief at 17.) On direct examination, appellant testified that when he surrendered himself to the police with his counsel present he was advised of his rights in accordance with the procedures outlined in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defense counsel examined him further on direct as follows:

Q. When you surrendered yourself, what happened then?

A. Well, you were there, advised me of my rights, said I didn't have to make a statement.

Q. After did there come a point in time when I left?

A. Yes, sir.

Q. Did Detective Schwartz ask you any questions after I left?

A. Yes.

Q. What did you tell Detective Schwartz after I left?

A. Well, I had told him I knew Donald and about the argument that happened the morning which implicated me and the crime.[10]

On cross examination, government questioning elicited the facts that appellant had not said anything to the police either about his alibi at trial, *viz.,* that he was elsewhere at the time of the murder, or about knowing that the decedent had a gun. (Record at 878–81.) During closing argument, the government argued to the jury in reference to appellant's stationhouse statements:

Then what does he say to the police? He didn't have to say anything to the police. He was advised not to say anything .... But does he mention to the police that he has a air-tight alibi? No, he doesn't. Didn't say a word about that. Why? Because he doesn't want the police checking it out. The police would have had six months to check out this alibi if he told them about it that night.

■■■ Appellant first claims that under the teachings of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the trial court should have prohibited altogether the introduction of the impeachment evidence. In *Doyle,* the Supreme Court held that the defendant's statement: "What's this all about" was insufficient to amount to a waiver of his right to remain silent and that an attempt to impeach the defendant by reference to his silence was constitutionally impermissible. *Id.* at 618, 96 S.Ct. at 2245. However, when a defendant volun-

tarily gives a statement concerning the offense after being given appropriate warnings, such evidence is admissible. *Miranda v. Arizona, supra* 384 U.S. at 448, 86 S.Ct. at 1614. "By speaking, he has chosen unambiguously not to assert his right to remain silent." *Hill v. United States,* 404 A.2d 525, 531 (D.C.1979). During direct examination, appellant stated that even though he had been advised of his rights and informed that "he didn't have to say anything," he thereafter made a statement to Detective Schwartz. (Record at 878.) Appellant was certainly free to disregard counsel's advice. In addition, there is no evidence in the record that appellant told Detective Schwartz that he did not want to be questioned. Under these circumstances, the *Doyle* rationale "falls out of the picture because [the defendant] has not remained silent," [11] *Hill, supra* at 531, and therefore, appellant's first argument must fail.

Alternatively, appellant argues that our decision in *Sampson v. United States,* 407 A.2d 574 (D.C.1979), requires reversal. In *Sampson,* we found that the government failed to show "a threshold inconsistency" between the defendant's testimony in court and the omissions in his statement to the police prior to trial denying involvement in the crime. *Id.* at 577. Specifically, the government had failed to establish the necessary foundation for the use of a prior inconsistent statement as impeachment evidence, and the evidence was not sufficient to show an inconsistency as to warrant admission. *Id.; see United States v. Hale,* 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975).

■■■ In order for an omission to constitute an inconsistency and hence permit impeachment, the prior statement must "fail to mention a material circumstance presently testified to, which it would have been natural to mention in the prior state-

---

**10.** The government had presented testimony that appellant and the victim had an argument near the scene of the crime approximately twelve hours before the murder. (Record at 42–44, 46–47.)

**11.** In *Doyle,* the defendant was speaking about the incident for the first time at trial. As such, the impeachment was truly an impeachment of the defendant's total silence prior to trial and thus impermissible.

ment...." *Sampson, supra* at 578; *see also,* 2A WIGMORE, *Evidence* § 1040 (Chadbourn rev.1970).

■ As in *Sampson,* appellant here did not give a statement to the police specifically concerning the facts surrounding the crime. All appellant said to the police was that he knew the decedent and that he knew about the argument the two of them had had on the morning of the murder. Detective Schwartz testified that appellant told him "he knew *nothing* about the shooting." (Record at 956; emphasis added.) The government argues that appellant's "failure to tell the authorities where he was at the time of the murder [was] so contrary to ordinary human experience that it [could] only be explained by consciousness of guilt." (Appellee's Brief at 32.) However, there is nothing to indicate that it would have been "natural" for appellant to mention his whereabouts at the time of the murder since there is nothing to indicate appellant knew when the shooting had occurred at the time he turned himself in to the police. To accept the government's position, we would need to impose an affirmative obligation on suspects appearing at the police station to account for their whereabouts over extensive periods of time without first possessing the necessary information of when the crime occurred. Appellant's omission of his alibi that he was elsewhere at the time of the murder from his statement to the police was therefore *not* a circumstance "it would have been natural to mention," *Sampson, supra* at 578. Accordingly, a "threshold inconsistency" between appellant's testimony and his statement to the police was lacking and the prosecutor's impeachment and closing argument were improper.

However, defense counsel made no objection at trial to the prosecution's cross-examination and the prosecutor's comment to the jury during his argument. Therefore, this

court may reverse only if such impeachment and argument amounted to "plain error affecting substantial rights." *Watts, supra.* We do not find the error to rise to such a level. Appellant was not prevented from presenting a full and adequate defense to the jury. As appellant's counsel recognizes in his brief (at 5), the alibi defense did not depend on appellant's testimony alone; both his girlfriend and brother testified as to his whereabouts at the time of the murder. (Record at 804, 809–12, 829.) In addition, although alibi was appellant's "principal" theory of defense (Appellant's Brief at 5), appellant did present testimony that someone else had actually committed the murder, thus setting up a second line of defense. (*See* Record at 647–57, 744, 942.)

The cross-examination and closing argument comment were a part of a lengthy trial involving numerous witnesses and producing transcript in excess of 1,000 pages. In addition, trial counsel engaged in aggressive representation of appellant, particularly with respect to his examination of three government eyewitnesses to the murder. Under all the circumstances, we conclude that appellant's substantial rights were not affected by the failure of the trial court to strike, without prompting by defense counsel, the prosecutor's argument to the jury and to intervene, *sua sponte,* when appellant was asked whether he had told the police of his alibi.[12]

## V

■ Finally, appellant argues that the trial court erred in refusing even to consider probation as an alternative to imposing life imprisonment for his conviction of murder in the first degree. The trial court's view was that it "had no option in connection with this matter" (Record at 40) and that it *must* impose a sentence of life imprisonment. (Record at 14.) Congress in D.C.Code § 22–2404 (1981), has evidenced a

12. Appellant also contends that the trial court's several errors, taken cumulatively, warrant reversal, citing *Dyson v. United States,* 418 A.2d 127 (D.C.1980). There, in contrast to the instant case, the government's case was quite weak, the errors were numerous, and the prosecutorial misconduct was unusually prejudicial.

firm determination that first-degree murder "shall" be punished by life imprisonment and that once a sentence of life imprisonment is imposed the prisoner shall not be eligible for parole until 20 years have elapsed. Thus, the statute provides in pertinent part:

(a) The punishment of murder in the first degree shall be life imprisonment.

(b) Notwithstanding any other provision of law, a person convicted of first-degree murder and upon whom a sentence of life imprisonment is imposed shall be eligible for parole only after the expiration of 20 years from the date he commences to serve his sentence.

Appellant points to the fact, however, that Congress has provided elsewhere in the Code that "in criminal cases" in the Superior Court the trial judge may suspend either the imposition of sentence or the execution of the sentence once imposed—provided the judge is satisfied "that the ends of justice," as well as the best interest of the public and the defendant, "would be served." D.C. Code, § 16–710 (1981).

Appellant argues that "there is a clear distinction in the probation statute ... [Section 16–710] between imposition and execution of sentences." (Appellant's Brief at 30.) Indeed, this court in *Schwasta v. United States,* 392 A.2d 1071, 1077 (D.C. 1978), carefully distinguished, in the context of when the trial court may grant probation, between suspending the imposition of sentence and suspending the execution of sentence once imposed. We concluded in *Schwasta* that the trial court is permitted "to grant probation only after it has imposed a sentence and suspended its execution." *Id.* at 1077. Thus, the grant of probation is permissible only when the sentencing court has *first* imposed a sentence. Since the Congress has *mandated* that the sentence imposed for first-degree murder shall be life imprisonment, the issue be-

comes whether the sentencing court, having imposed such sentence, has authority then to suspend execution of a life imprisonment sentence and place the defendant on probation. Appellant refers to this court's conclusion in *Sanker v. United States,* 374 A.2d 304 (D.C.1977), that probation is an alternative to sentencing to imprisonment one convicted of murder in the *second* degree. There, however, we acknowledged (at 308) that murder in the *first* degree was the subject of special statutory treatment that precluded probation. Thus, *Sanker* does not support appellant's position.

We note, too, that Congress has specifically determined the punishment for first degree murder to be mandatory life imprisonment and barred release on parole for such a defendant until he has served 20 years of his sentence. D.C.Code, § 22–2404(b) (1981). Additionally, Congress has consistently recognized that first-degree murder *must* be punished by the harshest penalty allowed by law. *See* D.C.Code, § 22–2404 (1981) (death penalty); *Frady v. United States,* 121 U.S.App.D.C. 78, 80, 348 F.2d 84, 86 (en banc), *cert. denied,* 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1968) (death or life imprisonment). We conclude it would be impossible for this court in the face of such Congressional action to authorize a sentencing judge who sentences a first degree murderer to life imprisonment then to suspend execution of this sentence and to place such defendant on probation. While we recognize a conceptual difference between the functions of probation and parole, *Davis v. United States,* 397 A.2d 951 (D.C.1979), we nevertheless deem the Congress to have fixed the severity of the sentence for first degree murder in recognition of the uniqueness of the crime and we must treat such Congressional action as conclusive.

*Affirmed.* [13]

---

**13.** Curiously, appellant urges that the court should have informed the jury that a sentence of life imprisonment is mandatory for one convicted of murder in the first degree. However, appellant did not request such instruction at trial and the question of possible punishment is not relevant to the jury's deliberations. *Criminal Jury Instructions of the District of Columbia,* No. 2.71 (3d ed. 1978).

MACK, Associate Judge, concurring:

I am haunted by a bizarre factual situation although it comes to me in a cold record. It reflects an urban phenomenon—a murder committed in a street scene before numerous witnesses in a densely populated but nevertheless psychologically isolated neighborhood in an inner city.[1] As Judge Kern points out, the government produced three eyewitnesses and the defense produced eight (quite apart from the defendant and his alibi witnesses). Obviously the critical issue for the jury was one of credibility.

Against this backdrop, the prosecutor's strategy of impeachment spawned several errors of the type that pose the risk of improperly influencing a jury. Like the majority, I am troubled by the government's use of the defendant's alleged pretrial inconsistent statement which in fact was not inconsistent (see *Hill v. United States*, 404 A.2d 525 (D.C.1979)) and the government's presentation, through rebuttal testimony, of an alleged prior inconsistent statement of a defense witness without having developed a foundation justifying the use of such rebuttal. See *United States v. Wright*, 160 U.S.App.D.C. 57, 489 F.2d 1181 (1973). Even more troubling is the government's use of prior voir dire testimony of its own witness for alleged impeachment purposes without making a claim of surprise or the requisite showing of damage to its case. See *Scott v. United States*, 412 A.2d 364 (D.C.1980). Such errors individually, and certainly collectively, would have furnished grounds for reversal under different circumstances. See, e.g., *Scott v. United States, supra; Sampson v. United States*, 407 A.2d 574 (D.C.1979); *United States v. Wright, supra.*

In considering the question of reversal in such cases, we have weighed among other factors, the strength of the government's case, and the danger that, in the absence of limiting instructions, the jury might have considered matters raised for impeachment purposes as substantive evidence. *Towles v. United States*, 428 A.2d 836 (D.C.1981); *Scott v. United States, supra; Walker v. United States*, 402 A.2d 424 (D.C.1979). The government's evidence here was strong; yet paradoxically it is the strength of the defense evidence, coupled with the superficially apparent and abortive nature of the government's attempts to discredit that defense—even as to collateral matters—that lead me to conclude that the impact of such errors could not have significantly prejudiced the defense. After a reading of the record, I agree with the majority that the errors complained of were either harmless (see *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)) or were not so clearly prejudicial as to jeopardize the very fairness and integrity of the trial. *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc).

---

1. An investigating police officer, asked whether he talked to certain people in the neighborhood answered, "Well, most of the people I talked to up there wouldn't give me the time of day, let alone their names."

On the other side of the coin, a resident of the area, asked about whether the police know about a prior shooting incident involving the victim, replied: "The police did not come. If you lived on Chapin Street, a lot of things happen that the police don't come to see."